## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Eddie Shelton, III,

                 Petitioner,      Case No. 17-cv-11703

v.                              Judith E. Levy
                               United States District Judge

Connie Horton,

                               Mag. Judge David R. Grand

                 Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS [1], DENYING CERTIFICATE OF APPEALABILITY, AND DENYING PERMISSION TO APPEAL IN <u>FORMA PAUPERIS</u>

Petitioner Eddie Shelton, III, a Michigan prisoner at the Chippewa Correctional Facility in Kincheloe, Michigan, filed a pro se habeas corpus petition under 28 U.S.C. § 2254. The petition challenges Shelton's plea-based convictions for first-degree home invasion, Mich. Comp. Laws § 750.110a(2), assault with a dangerous weapon ("felonious assault"), Mich. Comp. Laws § 750.82, and possession of a firearm during the commission of, or attempt to commit, a felony ("felony firearm"), Mich. Comp. Laws § 750.227b. Shelton argues that his trial and appellate

attorneys were constitutionally ineffective. Having carefully reviewed the pleadings and state-court record, Shelton's claims do not merit relief. Accordingly, the habeas petition is denied. The Court also denies a certificate of appealability and leave to proceed *in forma pauperis* on appeal.

## I. Background

### A. The Charges and Preliminary Examinations

Shelton was charged in two cases that arose in Saginaw County, Michigan. In case number 12-037137 ("case 137"), he was charged with felonious assault, domestic violence, third offense, and felony firearm. The victim testified at Shelton's preliminary examination that she and Shelton got into an argument at the home of Shelton's mother in Bridgeport, Michigan on January 15, 2012, and that Shelton poked her with a gun that day. (ECF No. 7-3, PageID.139–143.)

In case number 12-037153 ("case 153"), Shelton initially was charged with nineteen crimes, including first-degree home invasion, felonious assault, domestic violence, third offense, unlawful imprisonment, carjacking, torture, and several firearm offenses. These charges arose from an incident on March 4, 2012, in Buena Vista

Township. The victim was Keyanna Woods, who is the mother of Shelton's two children.

Four witnesses testified at the preliminary examination in case 153: Hridesh Selarka, Markeisha Reid, Tim Patterson, and Mark Scott. A summary of their testimony is set forth below.

## 1.  Hridesh Selarka

Hridesh Selarka testified that he was employed as the manager of the Motel 6 on South Outer Drive in Buena Vista. On March 4, 2012, he heard some noise and then saw a man on the second floor of the motel pull a woman out of room 209 to room 207 next door. Salarka did not recognize the two people; nor did he see their faces. There were four or five other people near room 209, and one person was trying to free the woman from the man. Selarka ran downstairs and called the police. When the police arrived, they went upstairs, but no one was in the rooms. (ECF No. 7-4, PageID.149–155.)

## 2.  Markeisha Reid[1]

---

[1] Ms. Reid's first name is spelled "Markisha" and "Markesha" in the transcript of the preliminary examination, but in her affidavit, which Shelton attached to his habeas petition, her first name is typed as "Markeisha."  The Court is using that spelling.

Markeisha Reid testified that she was sitting in her car at the motel on South Outer Drive on March 4, 2012. At some point she was in room 211 with friends. She left the room, and when she returned, the police were there.  (*Id*., PageID.157–158.)

When the prosecutor asked Ms. Reid about a handwritten statement that she gave to the police, Ms. Reid stated that she remembered writing a statement, but that she did not remember what happened and that she had merely written what people had told her. (*Id*., PageID.159–160.)

Upon further questioning by the prosecutor, Ms. Reid stated that she had seen a text message on Ms. Woods's phone, and in that message, Shelton threatened to shoot up Ms. Woods's room. Later, she and Ms. Woods exchanged text messages. In the text messages, Ms. Woods informed Ms. Reid that Shelton had knocked on her motel room door, pointed two guns at the people outside the room, and told the people outside to move out of the way. Ms. Woods also texted Ms. Reed that Shelton had then grabbed Ms. Woods, hit her with the gun, beat her on the face, and dragged her into room 207.  Ms. Woods also texted Ms. Reed that she (Ms. Woods) left with Shelton in her car. (*Id*., PageID.161–168.)

4

### 3. Officer Tim Patterson

Buena Vista Police Officer Tim Patterson testified at the preliminary examination that he responded to the Motel 6 on South Outer Drive on March 4, 2012. (*Id.*, PageID.172–73.) The initial call reported that male subjects, who were known to carry guns, were fighting outside. When he and Officer Norris arrived at the motel, he spoke with the motel manager who said that he saw an altercation between a male and a female and that he saw the female dragged from room 209 to room 207. Officers Patterson and Norris went to rooms 207 and 209, but they found no one in either room. At some point, Officer Patterson was advised that Veneccia[2] Henderson called 911 and stated that the victim, Ms. Woods, had left with Shelton in a white Cavalier car and gone to a residence near Perkins and 27th Streets. (*Id.*, PageID.172–75.)

Officers Patterson and Norris then went to Perkins and 27th Street where they were flagged down by three unidentified females in a green Chevy Lumina, who were supposedly friends with the victim, Ms. Woods. The three females took the officers to a location, which was supposed to

---

[2] Ms. Henderson's first name is spelled in different ways in the record. The Court is using the spelling that Ms. Henderson used when she signed her name on her affidavit, which Shelton attached to his habeas petition.

5

be Shelton's grandmother's house. The three females then informed the officers that one of them was talking to Ms. Woods on the phone, and that the white Cavalier had left that address and was headed toward the Eddy Building where Ms. Woods' mother supposedly resided. The female on the phone with Ms. Woods reported to the officers that Shelton was still in possession of guns. (*Id.*, PageID.175–177.)

Officers Patterson and Norris went to the Eddy Building, but by the time they got there, city police officers had already taken Shelton into custody. Shelton was sitting in the back of a city police car, and Shelton's girlfriend, Destini Abrams Shelton, was seated in another patrol car. The victim, Ms. Woods, was also there. Officer Patterson seized two silver handguns from the white Cavalier. Both guns had magazines with live ammunition, and one gun had a bullet in the chamber of the gun. (*Id.*, PageID.177–180, 184–185.)

Ms. Woods was visually shaken and scared, but Officer Patterson was able to interview her. Ms. Woods explained to Officer Patterson that she had been in room 209 at the Motel 6 and had received a text message from Shelton. In the message, Shelton stated that he knew she was in room 209 and that he should shoot up the room. Shelton arrived at room

6

209, but when he knocked on the door, Ms. Woods went into the bathroom to avoid him. Shelton entered the motel room and entered the bathroom, where he hit her on the head and face with handguns. Then, he grabbed her by the arm and leg and dragged her into the next room, where he hit her again. Ms. Woods also reported that she, Shelton, and Ms. Abrams Shelton subsequently entered Ms. Woods's car and drove to Shelton's grandmother's house. Ms. Woods told the officer that she was afraid to say anything at the grandmother's house because Shelton still had the guns with him. From the grandmother's house, they went to Woods's mother's home in the Eddy Building. On the way there, Shelton forced Woods to pull over to the side of the road, where he assaulted her again. Eventually they arrived at the Eddy Building and went inside, where they encountered the police. (*Id.,* PageID.180–182.)

Officer Patterson took photographs of Ms. Woods at the time he interviewed her. One photograph depicted an injury to Ms. Woods' right eye. She also had some swelling on the side of her face and on her left wrist. (*Id.*, PageID.182–183.) Officer Patterson also testified that he saw a text message from Shelton on Ms. Woods' phone, which read: "U in

Room 209 wit' 'Shae n dem . . i should shoot this bitch up." (*Id.*, PageID.183, 185.)

Shelton agreed to speak with Officer Patterson while seated in a squad car at the Eddy Building. Officer Patterson testified that Shelton was very cooperative, and he told Officer Patterson that he had obtained the guns as a prop for a video he planned to do. He stated that his intention was to scare people with the handguns. Shelton stated that he knew the guns were loaded and that one gun had a round in the chamber, but he claimed that both guns were inoperable. Shelton then explained that he had become upset when he saw Ms. Woods go into a room with other people. Initially, he knocked on her door, but she did not answer. He stated that, while there, he saw a man put his hand in his pocket. He thought the man was the same man who had jumped him on a previous occasion, and that the man may have been reaching for a gun when he put his hand in his pocket. This motivated Shelton to go back to room 207 and obtain two guns that were there. Then Shelton went back to room 209, and when the other men in the room walked toward him, he pulled out the guns to scare them. (*Id.*, PageID.186–189.)

8

Shelton also admitted to Officer Patterson that he had written in a text message to Ms. Woods that he wanted to shoot up the room. He further admitted to hitting Ms. Woods with his hand, not his gun, and that he had grabbed her and pulled her out of the room. He stated that they had gone to his grandmother's house, and later on the way to the Eddy Building, he had assaulted Ms. Woods. He explained that when they arrived at the Eddy Building, he had exited the vehicle and tried to get away because he had guns in the vehicle and he did not want to get tasered or shot. He also admitted that he ran after Ms. Woods when she went inside the Eddy Building, that he placed Ms. Woods between him and the police to shield himself from a police taser or gunshot. (*Id.*, Page ID.189–192.)

### 4. Officer Mark Scott

Saginaw Police Officer Mark Scott testified that he responded to the Eddy Building on March 4, 2012, because he had been monitoring the county police radio and had learned that a vehicle was on its way to the building with a suspect and a couple of guns. He saw the white vehicle that was described on the radio and a man (Shelton) seated in the front

passenger seat. The man looked over his shoulder at Officer Scott and then opened the door of the vehicle and ran into the building.

Officer Scott chased after Shelton. When Officer Scott caught up with Shelton inside the building, he was holding a woman (Ms. Woods) as a barrier between himself and the police. Ms. Woods was then released or got away, and the police detained Shelton. One of the officers then asked Shelton where the guns were, and Shelton stated that the guns were in the car. Officer Scott later observed two handguns lying on the front passenger floorboard. (*Id.*, PageID.195–203.)

Later in the preliminary hearing, the prosecution stated that they were unable to secure Ms. Woods or Ms. Henderson for testimony. The prosecutor conceded that there was an insufficient factual basis for some of the counts, but argued that with the testimony presented there was sufficient factual basis for other counts. The state district court judge then bound Shelter over for trial on some charges, but declined to bind Shelton over on eight other charges in case 153. (*Id.*, PageID.203–207.)

## B.  The Guilty Plea, Sentence, and Direct Appeal

Shelton pleaded guilty in both of his Saginaw County cases on the date set for trial, which was May 8, 2012. (ECF No. 7-5.) In case 137,

Shelton pleaded guilty to felonious assault and felony-firearm. In return for his guilty plea, the prosecution dismissed the domestic violence count. In case 153, Shelton pleaded guilty to first-degree home invasion, one count of felonious assault, and one count of felony-firearm. In return for his guilty plea, the prosecution dismissed eight additional charges for which Shelton had been bound over for trial.

The trial court sentenced Shelton on June 26, 2012. In case 137, the court sentenced Shelton to two years in prison for the felony-firearm conviction, with 113 days of credit for time served, and to a consecutive sentence of fifteen months to four years for the felonious-assault conviction. In case 153, the court sentenced Shelton to ten to twenty years in prison for the home-invasion conviction, a concurrent term of fifteen months to four years in prison for the felonious-assault conviction, and a consecutive term of two years for the felony-firearm conviction, with credit for 113 days. (ECF No. 7-6, PageID.240–242.)

In a delayed application for leave to appeal both cases, Shelton's appellate attorney wrote:

> (1) Defendant contends that he should be allowed to withdraw from the plea agreement. Counsel has not found any arguably meritorious plea withdrawal issue.

11

(2) Defendant requests that leave be granted so that he can challenge his sentencing. Counsel has not found any arguably meritorious issue for resentencing.

(ECF No. 7-11, PageID.307.)

Shelton later filed a motion to withdraw his guilty plea and a letter request to have the trial court remove his appellate attorney from the case. The trial court granted Shelton's request to have his appellate attorney removed from the case (ECF No. 7-11, PageID.516–517), but the court denied Shelton's motion to withdraw his guilty plea (ECF No. 7-11, PageID.518–521).

Meanwhile, Shelton filed a delayed *pro se* application for leave to appeal. He argued that: (1) his plea agreement was illusory; (2) his trial attorney had encouraged him to state facts that were not true; (3) his appellate attorney did not investigate the case, present any issues, or talk to the victim and witnesses; (4) a manifest injustice occurred in the way the prosecution and trial court handled the case; and (5) his plea was involuntary, unknowing, and not understandingly made. (ECF No. 7-11, PageID.475–499.)

Shelton also moved to voluntarily dismiss his appeal in case 137. (ECF No. 7-11, PageID.522.) On July 5, 3012, the Michigan Court of

Appeals granted Shelton's motion to withdraw his challenge to the convictions in case 137. (ECF No. 7-11, PageID.304.)

On August 14, 2013, the Michigan Court of Appeals denied appellate counsel's delayed application for leave to appeal in case 153 "for lack of merit on the grounds presented." *People v. Shelton*, No. 313609 (Mich. Ct. App. Aug. 14, 2013). (ECF No. 7-11, PageID.303.) In the same order, the Court of Appeals granted Shelton's request to file a *pro se* delayed application for leave to appeal. The court then denied the *pro* se application "for lack of merit on the grounds presented." *Id*. The Court of Appeals denied reconsideration on October 30, 2013. (ECF No. 7-11, PageID.719.)

Shelton subsequently filed a *pro se* application for leave to appeal in the Michigan Supreme Court. (ECF No. 7-13, PageID.762–770.) He raised the same issues that he had presented to the Michigan Court of Appeals in his *pro se* application for leave to appeal. He also raised a new claim, which alleged that he was told that if he did not plead guilty to first-degree home invasion, he would receive more prison time, regardless of innocence. On March 28, 2014, the Michigan Supreme Court denied

Shelton's application for leave to appeal because it was not persuaded to review the issues. *See People v. Shelton*, 495 Mich. 979 (2014).

## C.  The Post-Conviction Proceedings

On November 7, 2014, Shelton filed a motion for relief from judgment. In it, he argued that his trial and appellate attorneys were ineffective for failing to investigate the case and question witnesses. Shelton also alleged that appellate counsel had omitted significant and obvious issues in the direct appeal.

The trial court denied Shelton's motion because he had failed to establish entitlement to relief under Michigan Court Rule 6.508(D). (ECF No. 7-8, PageID.288–289.) Shelton sought reconsideration, but on August 3, 2015, the trial court denied reconsideration because Shelton had failed to show that the denial of his motion for relief from judgment was based on a clear error. (ECF No. 7-10, PageID.300–301.)

Shelton appealed the trial court's order, arguing that: (1) trial counsel was ineffective in failing to investigate and discover the exculpatory statements of three eyewitnesses before advising Shelton to accept a plea agreement; and (2) appellate counsel was ineffective for failing to raise his claim about trial counsel on direct appeal. The

14

Michigan Court of Appeals denied leave to appeal because Shelton had failed to establish that the trial court erred in denying his motion for relief from judgment. The Court of Appeals also stated that Shelton's grounds for relief were decided against him in his prior appeal and that he had not alleged a retroactive change in the law that undermined the prior decision. *See People v. Shelton*, No. 330754 (Mich. Ct. App. May 4, 2016). (ECF No. 7-12, PageID.720.) Shelton moved for reconsideration, but the Court of Appeals denied reconsideration on June 20, 2016. (ECF No. 7-12, PageID.758.)

Shelton then applied for leave to appeal in the Michigan Supreme Court. On January 5, 2017, the Michigan Supreme Court denied leave to appeal because Shelton had failed establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Shelton*, 500 Mich. 925 (2017).

### D.  The Habeas Petition, Answer, and Reply

Shelton dated his habeas corpus petition on May 23, 2017, and on May 30, 2017, the Clerk of the Court filed the petition. (ECF No. 1.) The petition challenges only Shelton's convictions for home invasion, felonious assault, and felony firearm in case 153. As set forth above,

15

Shelton alleges that his trial and appellate attorneys were ineffective because the attorneys did not investigate his case and contact witnesses who could have supported his claim of innocence. Shelton also alleges that appellate counsel was ineffective for not raising any issues on direct appeal.

Respondent Connie Horton argues in response that the Michigan Court of Appeals reasonably rejected Shelton's claims on the merits. (ECF No. 6, PageID.82.) Shelton argues in reply that the state courts did not reasonably reject his claims. (ECF No. 8.)

## II.  Legal Standard

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") limits the authority of a federal district court to grant habeas relief on a claim that was adjudicated on the merits by the state courts. *See* 28 U.S.C. § 2254(d). A § 2254 petition may only be granted if the state court adjudication was "contrary to" or resulted in an "unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

A state-court decision is "contrary to" clearly established law "if the state court arrives at a conclusion opposite to that reached by the

16

Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Moore v. Mitchell*, 708 F.3d 760, 774 (6th Cir. 2013) (citing *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). A state-court decision is an "unreasonable application of clearly established" law "where 'the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the case.'" *Carter v. Bogan*, 900 F.3d 754, 767 (6th Cir. 2018) (alteration in original) (quoting *Williams*, 529 U.S. at 413).

An "unreasonable application" is more than incorrect; it must be "objectively unreasonable." *Id.* at 767–68 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). In other words, the federal habeas court must find that "the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id.* (alteration in original) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A § 2254 petition should be denied if it is within the "realm of possibility" that "fair-minded jurists" could find the state-court decision was reasonable. *Woods v. Etherton*, 136 S. Ct. 1149, 1152 (2016).

When a state court fails to address the merits of a petitioner's claim, the deference due under AEPDA does not apply, and review is *de novo*. *See Maples v. Stegall* , 340 F.3d 433, 436 (6th Cir. 2003) (explaining that when "the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply"); *Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (stating that, "[w]hen a state court fails to address the petitioner's federal claim, we review the claim de novo").

## III. Analysis

### A. Trial Counsel

Shelton argues that his trial attorney was ineffective because the attorney failed to investigate the case and discover the exculpatory statements of eyewitnesses before advising him to accept a plea offer. According to Shelton, his trial attorney made no effort at all to contact witnesses to determine whether the witnesses would testify at trial and, if so, what they would say. Shelton alleges that he told his attorney he was innocent and reluctant to plead guilty and that he asked his attorney to contact the victim and two eyewitnesses because the witnesses would have affirmed his claim of innocence. The attorney, nevertheless, advised

18

him to plead guilty. Shelton alleges that, if his attorney had contacted the witnesses, the attorney would have discovered that there was no evidence against him, and he would not have pleaded guilty.

Shelton raised his claim about trial counsel during post-conviction proceedings,[3] but none of the state courts adjudicated his claim on the merits. Therefore, this Court's review is *de novo*.

### 1.  Clearly Established Federal Law

To prevail on his claim about trial counsel, Shelton must demonstrate that "counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Unless he makes both showings, it cannot be said that his convictions "resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

*Strickland's* two-part test "applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58 (1985). "The performance prong of *Strickland* requires a defendant to

---

[3]  Although Shelton did raise a claim about trial counsel on direct appeal, the basis for his claim there was that counsel was ineffective for telling him to state facts that were not true. This is a different argument from Shelton's current claim that trial counsel failed to investigate the case and contact witnesses.

show that counsel's representation fell below an objective standard of reasonableness." *Lafler v. Cooper*, 556 U.S. 156, 163 (2012) (quotation marks and citations omitted).

The "prejudice" requirement "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59. The defendant must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Id.*

Shelton's specific claim is that his trial attorney failed to investigate and contact witnesses. Defense attorneys have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. The duty to investigate "includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence." *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). Nevertheless, "counsel may exercise his professional judgment with respect to the viability of certain defenses and evidentiary matters without running afoul of the Sixth Amendment." *Lewis v. Alexander*, 11 F.3d 1349, 1353–54 (6th Cir. 1993).

## 2.   The Affidavits

Shelton claims that his trial attorney should have contacted Ms. Woods, Ms. Reid, Ms. Henderson, and Ms. Abrams Shelton. To support his argument, Shelton has submitted affidavits from each of them. Their affidavits, which were submitted well-after the 2012 plea negotiations, set forth a version of the facts more favorable to Shelton than were testified to at the preliminary hearing.

For the reasons set forth below, the affidavits are not persuasive that Shelton's trial attorney's performance fell below the objective standard for reasonableness. All of the affidavits, as well as Shelton's affidavit, are summarized below as context for Shelton's claim about trial counsel's performance.

### Keyanna Woods's Affidavits

As set forth above, Ms. Woods was the victim in case 153. She signed two affidavits; the first was signed on December 4, 2013, and the second was signed on January 8, 2013.

In her affidavit signed on January 8, 2013, Ms. Woods states that Shelton did not force his way into her motel room on March 4, 2012, and

that he did not carjack her; instead, she states that she offered him a ride in her car. (ECF No. 1, PageID.69.)

In a longer affidavit signed on December 4, 2013, Ms. Woods alleges that, on or about March 4, 2012, she and a few friends, including Ms. Henderson, were in room 209 at the Motel 6 on Outer Drive in Buena Vista. Shelton, who is the father of her children, sent her a text message which stated that he knew where she was and that "he should shoot up the room." (ECF No. 1, PageID.48.) She did not know that the message came from Shelton because he had a new phone number. She realized who the message came from him after he knocked on the door, said that the message was a joke, and explained he was trying to give her and Ms. Henderson his new number.

Ms. Woods states that Shelton was let into room 209. The three of them then sat around and joked with each other until an acquaintance named Gucci[4] arrived at the motel. Ms. Woods states that she did not know up until then that Gucci and Shelton did not like each other, and that Gucci had assaulted Shelton in the past. Ms. Woods states that when

---

[4] Gucci is only referred to by the name "Gucci" in the record. It is unclear what his full name is, so the Court will refer to him as Gucci.

Shelton found out that Gucci was there to visit her, Shelton slapped Ms. Woods "because he thought Gucci had been around my kids," and believed Gucci was "dangerous, [and] could have harmed my daughters because of his beef with [Shelton]." (*Id.*, PageID.48–49.) Gucci and his friends made some "threatening gestures" when Shelton slapped Ms. Woods, and these gestures "caused [Shelton] to pull out two guns before walking out of the room." (*Id.*, PageID.49.)

Ms. Woods then states that she "followed behind" Shelton to room 207 where she saw Ms. Abrams Shelton and "tried to get in a fight with her" because Ms. Abrams Shelton was pregnant by Shelton. (*Id.*) Shelton, however, would not allow Ms. Woods to enter the room. Ms. Woods states she then walked back to room 209 and learned that the hotel manager was calling the police. Shelton also heard that the police had been called, and told Ms. Woods that he and Ms. Abrams Shelton were leaving. Ms. Woods states that she offered to give them a ride because she did not want Ms. Abrams Shelton, who was pregnant, to be walking in the cold, and because she thought Shelton would have gotten caught by police if they left on foot.

As the three of them were leaving, Ms. Woods states that she saw some police cars and got nervous, but Shelton told her to go to his grandmother's house on 27th Street. Once there, she had a bad feeling and suggested that they leave. She subsequently took Shelton and Ms. Abrams Shelton to her mother's house at the Eddy Building because she "thought we would be safer there." (*Id.*) Ms. Woods told Ms. Henderson to meet her there, and when Ms. Henderson, Ms. Reid, Jade,[5] and the police arrived, the police chased Shelton into the building.

As they were standing outside the Eddie building, Ms. Woods states that, "a friend of the family showed up and told me that I was stupid for riding around with [Shelton] and [Ms. Shelton Abrams] in my car, and that I should make him pay for getting another girl pregnant. It did make me jealous that [Ms. Abrams Shelton] was pregnant with his son, so I went along with it and gave a false statement to the police." (*Id.* at PageID.50.)

At the end of her affidavit, Ms. Woods reiterates that Shelton did not force his way into her motel room, did not hit her with a gun, and did

---

[5] At the preliminary examination, Ms. Reid testified that her friend Jade's last name is Hatfield, but that she was unsure of the spelling. Accordingly, she will be referred to only as "Jade" in this opinion. (ECF No. 711, PageID.624.)

not carjack her. She states that the reason she did not appear in court for the preliminary hearing was that she was warned by a family friend that she could go to jail for perjury if she admitted that she previously lied. Finally, she states that she was not threatened or promised anything for coming forward with the truth. (ECF No. 1, PageID.48–50.)

### Markeisha Reid's Affidavit

In an affidavit dated December 10, 2015, Markeisha Reid states that, on or about March 4, 2012, she and her sister rented room 211 at the Motel 6 in Buena Vista Township. Her friend Jade called her and invited her to a gathering with mutual friends in Room 209. Instead of going to room 209, she first went to the parking lot to charge her phone. There, she saw Jade and Ms. Henderson run to a green car, Ms. Woods run to a white car, a group of males ran to a black truck, and "a guy that goes by Two-Seven (Eddie)" along with a pregnant woman walk to the white car occupied by Ms. Woods. (ECF No. 1, PageID.51.) Ms. Reid states that she was on her way to see a friend when Jade called her and told her there was a fight, that people had guns, and that everyone had left to avoid the police. Jade asked Ms. Reid to meet her at the Eddy Building and told her what had happened in the motel room.

When Ms. Reid arrived at the Eddie building, the police were there, and Ms. Henderson, Ms. Woods, Jade, and a few men were talking to the police.

Ms. Reid states in her affidavit that, at the time of the incident, she wrote a false statement to support what her friends had told the police. Later, she says that she found out that "it was all a lie to get Two-Seven (Eddie) in trouble." (*Id.*, PageID.51.) She states that she went to court and admitted that the statements were all lies and that no other witnesses wanted to show up to the preliminary examination and do the same, potentially exposing themselves to perjury charges. (ECF No. 1, PageID.51–52.)

## Veneccia Henderson's Affidavits

In a brief affidavit dated March 8, 2013, Veneccia Henderson states that, on March 4, 2012, Shelton came to room 209 at the Motel 6 on Outer Drive in Buena Vista Township. She states that Shelton was admitted to the room voluntarily and did not force his way into room 209. She also states that Shelton exhibited no violent behavior toward her at any time. (ECF No. 1, PageID.71.)

In a second affidavit signed on December 4, 2013, Ms. Henderson states that, on or about March 4, 2012, she and Ms. Woods rented room 209 at the Motel 6 on Outer Drive in Buena Vista Township. On that night, Shelton sent a text to her and Ms. Woods's phones from an unknown number. The text message stated that he knew where they were, who they were with, and the song they were playing. He also stated that he should shoot up the room. They were scared until Shelton knocked on the door and she let him in the room. He told them that he sent the text and that he was joking and wanted them to store his new number in their phones.

As the three of them sat there talking and making jokes, three men, including Gucci, arrived. She states that Gucci and Shelton knew each other and started arguing. Shelton told Ms. Woods that she was "grimey" for having Gucci around his kids, knowing that he had a "beef" with Gucci. Then, Shelton got mad and slapped Ms. Woods. At that point, Gucci reached under his shirt as if he had a gun or another weapon. Shelton then pulled out two guns and told Gucci to get out of his way. Shelton walked out of the room, and Ms. Woods followed him to room 207. Ms. Woods was angry when she saw Shelton's girlfriend, and Shelton

would not let Ms. Woods in the room. Shelton informed Ms. Woods that his girlfriend was pregnant and that they had nowhere to go for the night.

Ms. Henderson states that she heard the hotel manager say that he was calling the police. Ms. Henderson then told Shelton to leave because there were warrants out for his arrest. Shelton and his girlfriend were planning to leave on foot until Ms. Woods offered to give them a ride and told them to meet her in the parking lot. Ms. Woods told Ms. Henderson to meet at Ms. Woods's mother's home in the Eddy Building. When Ms. Henderson arrived there with Ms. Reid and Jade, Shelton was in a police car.

Ms. Henderson states that a woman whom Ms. Woods knew told Ms. Woods that they should "should make [Shelton] pay for getting another girl pregnant." (Id. at PageID.54.) She states that the woman "talked us all into giving the police false statements. She told us that it wouldn't get [Shelton] into serious trouble, and that he deserved it for not 'keeping it in his pants.' The woman convinced us and we all went along with the story." (Id.)

Ms. Henderson's affidavit states that she wanted to tell the truth, but she did not want to go against Ms. Woods, nor did she think that it

28

was serious. She states that did not show up at the preliminary hearing because she thought that if she told the truth, she would go to jail. She now wishes that she had told the truth.

At the end of her affidavit, she reiterates that Shelton did not threaten her that day or attempt to harm her, and that he showed no violence toward her at any time. She states, in closing, that she was not threatened or promised anything to come forward with the truth.  (ECF No. 1, PageID.53–55.)

### Destini Abrams Shelton's Affidavits

In an affidavit signed on January 8, 2013, Destini Abrams Shelton states that, on March 4, 2012, she was in room 207 of the Motel 6 on Outer Drive in Buena Vista Township. Ms. Woods was next door in room 209. She states that she heard Ms. Woods tell Shelton to get in Ms. Woods's car, which was in the parking lot of the motel. She also states that she heard someone in Ms. Woods's room tell Shelton to come into the room. She states that Shelton did not force his way into Ms. Woods's room, nor did he force his way into her car. She also states that Ms. Woods also told her to get in the car and not to run away.  (ECF No. 1, PageID.70.)

29

In another affidavit, signed on December 4, 2013, Ms. Abrams Shelton states that, on or about March 4, 2012, she and Shelton shared room 207 at the Motel 6 on Outer Drive in Buena Vista Township. Shelton informed her that he saw Ms. Woods and some other women walk into room 209, which was next door to their room. He told her that he was going to send some text messages to the women's phones as a joke and to scare them. After sending the text message, she states that Shelton indicated that he was going to room 209 to smoke a "blunt" with Ms. Woods and her friends.

About twenty or thirty minutes later, Shelton returned to room 207 and told Ms. Abrams Shelton to get dressed. She saw him push Ms. Woods away from their door. About fifteen minutes later, Ms. Woods told Ms. Abrams Shelton and Shelton to meet her in the parking lot. Shelton then explained that he had an argument with Ms. Woods's boyfriend and that police were called. Ms. Woods took them to Shelton's grandmother's house and then to Ms. Woods's mother's house where the police arrested Shelton.

Ms. Abrams Shelton states that she told the police what she knew, except for the part that Ms. Woods had offered to give her and Shelton a

ride. She was not asked to testify at the preliminary hearing, although she did ask Shelton's lawyer to call her as a witness. She states in her affidavit that, if called, she would have testified that Ms. Woods told her and Shelton to get in the car. In closing, Ms. Abrams Shelton states that she was not threatened or promised anything to come forward with the truth. (ECF No. 1, PageID.56–57.)

### Shelton's Affidavit

Petitioner's affidavit is dated November 25, 2015.  He states the following in his affidavit.

On or about March 4, 2012, he rented room 207 at the Motel 6 on Outer Drive in Buena Vista Township. At the time, Ms. Abrams Shelton was pregnant with their son. When he turned on his phone, he noticed text and voice messages, some of which were from Ms. Woods.

About thirty or forty-five minutes later, he heard voices in the motel that sounded like Ms. Woods, Ms. Henderson, and others. He sent a text message to both Ms. Woods and Ms. Henderson, stating that he knew where they were, who they were with, what room they were in, and what music they were playing. He sent another text message in which he said that he should shoot up the room. He then knocked on the door to room

209, called the women's names, and identified himself. They opened the door and told him to come in. Ms. Henderson and Ms. Woods showed him the text messages on their phones. He then informed them that the text message was a joke and that he had been trying to scare them.

Ms. Woods told him about Gucci, whom she had been dating, and the fact that Gucci had met their children once. About fifteen minutes later, three men, including Gucci with whom he had a few previous altercations, entered the room. Shelton began arguing with Gucci. He slapped Ms. Woods, stating that he did so because Ms. Woods admitted that Gucci was there to see her and that Gucci had been at her house during the previous July or August. Gucci and the two other men reached for something as if they had guns. So, Shelton states that he pulled out two guns "that were not able to fire" and told the men to let him out of the motel room. (*Id.*, PageID.61.)

Shelton returned to room 207 and told Ms. Abrams Shelton that they had to leave because he had "gotten into it" with Ms. Woods's boyfriend. (*Id.*, PageID.62.) He states that Ms. Woods heard Ms. Abrams Shelton's voice and tried to get into room 207 to fight with her. Shelton pushed Ms. Woods away. Then, the men and three women from room 209

started running in the opposite direction, and Ms. Henderson explained that he should leave because he had warrants and the hotel manager was calling the police.  Ms. Woods then offered to give him and Ms. Abrams Shelton a ride in her car.

Ms. Woods drove them to Shelton's grandmother's house, but after someone called Ms. Woods and stated that they had been followed, Ms. Woods drove them to her mother's home in the Eddy Building. When they reached the Eddy Building, Ms. Woods entered the building to call the elevator and told him to enter the building with Ms. Abrams Shelton. The police then arrived, and Shelton ran into the building. Two officers ran into the building behind him and arrested him.

He told the officers that both guns were in the white Cavalier, that the guns belonged to him, but that neither gun could fire. He explained to the officers that he ran because he had guns and feared that he would be shot if he were caught with the guns. When he saw Ms. Woods and Ms. Abrams Shelton in separate patrol cars, he thought they were going to jail. He agreed to speak with Officer Patterson because he wanted to prevent Ms. Woods and Ms. Abrams Shelton from being incarcerated.

33

He admitted to Officer Patterson that the guns were his, that he had slapped Ms. Woods, and that he had sent a text to Ms. Woods's phone. But, he states, he did not commit a home invasion; he states that he was invited into room 209.

Shelton further states that when he met his trial attorney, he told the attorney what had happened on March 4, 2012. He also told the attorney that the charges were false and that, if the attorney asked Ms. Woods, Ms. Abrams Shelton, Ms. Henderson, Jade, or anyone else who was present that night, the attorney would discover that his claim of innocence was true. Although the attorney assured him that he would look into the matter, the attorney did not conduct an investigation.

Shelton states that he had no knowledge of Ms. Reid's existence before she testified at the preliminary examination. But, he states, her testimony shows that the charges are false and that the entire case was "built on lies." (*Id.*, PageID.65.) Shelton asked his attorney to cross-examine Ms. Reid, but his attorney refused. He also asked his attorney to have Ms. Abrams Shelton testify, but his attorney did not call her as a witness. Nor did his attorney permit Shelton to testify.   (*Id.* at PageID.65.)

34

Shelton states that his attorney never investigated the case to prove his innocence; instead, his attorney asked him to plead guilty to five of the charges in exchange for having the other charges dropped. Shelton told the attorney that he was innocent and that, if the attorney interviewed the victim and other witnesses, the attorney would see that Shelton was innocent. The attorney, however, told him that if he did not accept the plea offer, the prosecution would try to make the carjacking charge stick, and he would receive life or any number of years. Shelton therefore accepted the plea agreement, and states in his affidavit that he did so under duress and for fear of dying in prison.

The trial court initially declined to accept his guilty plea because of Shelton's statement that he was permitted to be in the hotel room. Shelton's attorney then told Shelton to say that he nudged the door and that he would forfeit the agreement, face the carjacking charge, and possibly get life in prison if he did not admit to nudging the door. He states that he complied with his attorney's advice under duress.

Shelton informed his appellate attorney about the incident on March 4, 2012, and about his trial attorney's conduct. His appellate attorney, however, filed a brief in which he stated that Shelton's claims

had no merit and that there were no witnesses willing to help him prove his innocence. According to Shelton, Ms. Woods, Ms. Henderson, Ms. Abrams Shelton, and Ms. Reid's affidavits show that both of Shelton's court-appointed attorneys were "incompetent, ineffective, and liars." (*Id.*, PageID.58–68.)

### 3. Discussion

The affidavits summarized above contain some common factual themes: that Shelton was invited into Ms. Woods's motel room, that he slapped her but did not assault her with a gun, and that he did not force her to drive him anywhere, rather, she invited him into her vehicle. However, there is no evidence that the affidavits existed at the time of the plea negotiations in 2012. Rather, three were dated and signed in 2013 and the fourth was dated and signed in 2015. (ECF No. 1, PageID.48–68.)

Additionally, at the time of the preliminary hearing, there was no reason to believe that these witnesses would have signed affidavits supporting Shelton's claim of innocence. Ms. Woods, for example, was injured during the incident and visibly shaken and scared after the incident. (*Id.*, PageID.180, 183.) Any recantation of her statement to the

36

police likely would have been treated "as suspect and untrustworthy." *See People v. Canter*, 197 Mich. App. 550, 559 (1992) (stating that, "where newly discovered evidence takes the form of recantation testimony, it is traditionally regarded as suspect and untrustworthy"). Moreover, the prosecution was unable to locate Ms. Woods or Ms. Henderson at the time of the preliminary examination. (ECF No. 7-4, PageID. 203–204.)

As for Ms. Reid, the information that she gave at the preliminary examination was consistent with the charges against Shelton at that time. For example, she admitted at the preliminary examination that she had prepared a handwritten statement in which she informed the police that Shelton had sent Ms. Woods a text message saying that he was going to shoot up the room. Ms. Reid's statement to the police also indicated that Shelton had knocked on the motel room door, grabbed Ms. Woods, hit Ms. Woods with the gun, dragged her into room 207, and then left in her car. (ECF No. 7-4, PageID. 161–162, 168.) Although Ms. Reid was a reluctant prosecution witness who claimed not to see what happened, she stated that other people had told her what happened. And even if her handwritten statement to the police was based on hearsay, it provided a basis for concluding that Shelton had committed one or more crimes

37

against Ms. Woods, consistent with the other information the prosecution had at the time, and that further investigation into the truthfulness of her story was unnecessary.

There was other evidence suggesting that contacting the witnesses would have been futile, and that a favorable plea bargain was the best way to help Shelton. Officer Tim Patterson corroborated in part Ms. Woods's version of the facts by photographing her injuries and by taking a picture of the text message in which Shelton stated that he should shoot up the room. (*Id.*, PageID.182–183, 185.)

In addition, the fact that Shelton made a statement to Officer Patterson admitting to sending the text message about shooting up the women's motel room indicates that his trial attorney's strategy was reasonable. He also admitted being armed in Ms. Woods's motel room, hitting her with his hand, pulling her out of the room, assaulting her on the way to the Eddy Building, and using her as a shield against the police. (*Id.*, PageID.189–192.)

Finally, even if Shelton's attorney had contacted the witnesses and obtained their affidavits, the difference in the version of facts set forth in the affidavits after the fact versus their statements at the time of the

incident may not have helped Shelton's position. The statements in the affidavits are not plausible. One would need to believe that Ms. Woods voluntarily offered to give Shelton a ride in her car after Shelton slapped her, threatened to shoot up her room, and then appeared at her room with two guns. The affidavits also indicate that Ms. Woods offered to give Ms. Abrams Shelton a ride even though Ms. Woods had contrarily tried to enter room 207 and fight with Ms. Abrams Shelton. Further, Ms. Abrams Shelton's affidavit is suspect because she was Shelton's girlfriend at the time and was pregnant with their baby. There is a risk of bias in affidavits made by close friends and relatives of the petitioner. *Cleveland v. Bradshaw*, 693 F.3d 626, 641 (6th Cir. 2012).

For the reasons set forth above, trial counsel made a reasonable decision that further investigation of Shelton's innocence was unnecessary. He could have reasonably concluded from the strength of the evidence against Shelton that it was in Shelton's best interests to negotiate a plea agreement in which several charges, including a charge of carjacking, were dismissed. Counsel's performance did not fall below an objective standard of reasonableness.

Trial counsel's performance also did not prejudice the defense. Shelton would have faced eight additional charges, including carjacking, if he had gone to trial, and the penalty for carjacking is life imprisonment or any term of years. Mich. Comp. Laws § 750.529a(1); *cf.* Mich. Comp. Laws § 750.110a(5) (setting the maximum penalty for first-degree home invasion at twenty years in prison).

Shelton, moreover, has not demonstrated a reasonable probability that, but for counsel's alleged errors, he would have declined to plead guilty and would have insisted on going to trial. Although initially he was reluctant to admit that he committed a home invasion, he ultimately admitted that he forced his way into Ms. Woods's motel room and hit her on the head with the end of a gun. (ECF No. 7-5, PageID.219–221.) He also stated that that no one had threatened him to make him plead guilty, that he was pleading guilty because he was guilty, and that it was his own choice to plead guilty. (*Id.*, PageID.216.) The trial court determined that Shelton's plea was understanding, voluntary, accurate, factually supported, and free from duress or coercion. (*Id.*, PageID.223.)

Further, at his sentencing, Shelton stated that he regretted his actions and that he needed some type of help for his attitude. He also

apologized to relatives, his fiancée, the courts, and everyone for his mistake. (ECF No. 7-6, PageID.239.) Given that this is the information that his trial counsel knew at the time, counsel's performance was not deficient.

To conclude, trial counsel's performance was not deficient, and the allegedly deficient performance did not prejudice Shelton. His claim of ineffective assistance by his trial counsel lacks substantive merit.

## B. Appellate Counsel

In his only other claim, Shelton alleges that his appellate attorney was constitutionally ineffective because the attorney: (1) did not conduct an investigation and failed to discover exculpatory statements of eyewitnesses; (2) filed a brief that did not raise claims Shelton wanted to raise, and argued against Shelton's claims; and (3) refused to raise a claim of ineffective assistance of trial counsel. Shelton raised this issue on direct appeal and during post-conviction proceedings. The only court to adjudicate the issue on the merits was the Michigan Court of Appeals on direct appeal. It denied leave to appeal for lack of merit in the issue.

### 1. Clearly Established Supreme Court Precedent

The standard for evaluating a claim about appellate counsel is the standard enunciated in *Strickland*. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). To prevail on his claim about appellate counsel, Petitioner must demonstrate (1) that his appellate attorney acted unreasonably in failing to discover and raise non-frivolous issues on appeal, and (2) there is a reasonable probability the defendant would have prevailed on appeal if his attorney had raised the issues. *Id.* (citing *Strickland,* 466 U.S. at 68791, 694).

### 2. Application

Shelton's allegation that appellate counsel was ineffective for failing to investigate witnesses lacks merit because, at the time, there was no credible basis for believing that the witnesses, particularly the victim, would support Shelton's claim of innocence. Further, as counsel pointed out in his delayed application for leave to appeal, even if an affidavit were obtained, recantations are traditionally regarded as suspect and unworthy under *Canter*, 197 Mich. App. at 559. (ECF No. 7-11, PageID.312.) Appellate counsel made a reasonable decision that further investigation was unnecessary.

Shelton's allegation that appellate counsel should have raised a claim about trial counsel also does not warrant relief, because Shelton's underlying claim about trial counsel lacks merit. "[B]y definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

As for Shelton's contention that his appellate counsel raised no claims on appeal and essentially argued against Shelton, this claim likewise is not a basis for relief. "Although a defense attorney has a duty to advance all colorable claims and defenses, . . . [i]t is the obligation of any lawyer—whether privately retained or publicly appointed—not to clog the courts with frivolous motions or appeals." *Polk Cty. v. Dodson,* 454 U.S. 312, 323 (1981). Stated differently, an appellate attorney

> may not ignore his or her professional obligations.  Neither paid nor appointed counsel may . . . . consume the time and the energies of the court or the opposing party by advancing frivolous arguments.  An attorney, whether appointed or paid, is therefore under an ethical obligation to refuse to prosecute a frivolous appeal.

*McCoy v. Court of Appeals of Wisconsin, Dist. 1*, 486 U.S. 429, 436 (1988).

The record indicates that Shelton's appellate counsel met with Shelton (ECF No. 711, PageID.513), evaluated Shelton's case carefully

and determined that there was no basis for filing a motion to withdraw the plea. However, appellate counsel did not decide to withdraw at that time. Rather, appellate counsel pointed out in his delayed application for leave to appeal that, even if Shelton were permitted to withdraw his guilty plea, he could have faced the original charges, and if he had been convicted on the carjacking charge, the guidelines would have exceeded the guidelines for home invasion. (ECF No. 7-11, PageID.314.) As for Shelton's sentence, appellate counsel stated that, even if the sentencing guidelines were re-scored under the most optimistic of scenarios, the guidelines range would not have changed. (*Id.* at PageID.316.)

Shelton brought a claim before the trial court judge, arguing that his appellate counsel committed misconduct. The trial court granted Shelton's request to permit his appellate counsel to withdraw. (ECF No. 7-11,PageID.516–17.) Shelton was then permitted to raise his claims in a *pro se* appellate brief, and the Michigan Court of Appeals denied leave to appeal because it found no merit in the *pro se* claims. (ECF No. 7-11, PageID.303.)

Under *Anders v. California*, 386 U.S. 738 (1967), appellate counsel may move to withdraw from representation if, following a "conscientious

44

examination," counsel determines that the case is "wholly frivolous." *Id.* at 744. Counsel's request to withdraw should be "accompanied by a brief referring to anything in the record that might arguably support the appeal." *Id.* In *Smith v. Robbins*, 528 U.S. 259 (2000), the Court explained that, if counsel fails to file a merits-brief on the client's behalf, the defendant must still show that counsel was objectively unreasonable under *Strickland*, in failing to find arguable issues to appeal. Then, counsel has the burden to demonstrate prejudice. *Id.* at 285–86. (citing *Strickland*, 466 U.S. at 694, 687–91).

A challenge to Shelton's guilty plea and sentence would have been frivolous. Therefore, appellate counsel's refusal to challenge the guilty plea and sentence did not amount to deficient performance. He acted reasonably in concluding that there were no non-frivolous issues to raise on appeal.

Appellate counsel's performance also did not prejudice Shelton, because there is no reasonable probability that Shelton would have prevailed on appeal if his attorney had raised his appellate issues. The Michigan Court of Appeals did receive and consider Shelton's *pro se* brief

and considered Shelton's arguments, but rejected them on their merits. (ECF No. 7-11, PageID.303.)

Finally, once appellate counsel concluded that there were no nonfrivolous claims, he correctly advised the appellate court of his conclusions, and was ultimately removed from the case (ECF No. 7-11,PageID.516–17) which allowed Shelton the opportunity to present his own arguments to the court on appeal. For the reasons set forth above, the state appellate courts' rejection of Shelton's claim about appellate counsel was not unreasonable.

## IV. Conclusion and Order

For the reasons set forth above, Shelton's first claim lacks merit, and the state courts' rejection of his second claim was not contrary to clearly established Supreme Court precedent, not an unreasonable application of Supreme Court precedent, nor an unreasonable determination of the facts. Therefore, the petition for a writ of habeas corpus (ECF No. 1) is denied with prejudice.

Federal Rule of Appellate Procedure 22(b)(1) provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Rule 11(a) of the Rules Governing Section 2254

Cases requires the Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."

To obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right, 28 U.S.C. § 2253(c)(2), which is satisfied only if reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

Reasonable jurists would not find this Court's assessment of Shelton's claims to be debatable or wrong. Nor would reasonable jurists conclude that the issues deserve encouragement to proceed further. Consequently, Shelton is not entitled to a certificate of appealability. *See Millender v. Adams*, 187 F. Supp.2d 852, 880 (E.D. Mich. 2002). He may apply to the Court of Appeals for a certificate of appealability.

The Court further concludes that an appeal from this decision could not be taken in good faith. Therefore, Shelton may not proceed *in forma pauperis* on appeal. Fed. R. App. P. 24(a)(3).

IT IS SO ORDERED.

Dated: September 30, 2020        s/Judith E. Levy
Ann Arbor, Michigan              United States District Judge

47

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on September 30, 2020.

<u>s/William Barkholz</u>
Case Manager